UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

VERNON DIGGS, individually and
on behalf of those similarly situated,

     Plaintiff,

v.

                                      CASE NO.: 3:18-cv-00367-MMH-MCR

**DISPOSITIVE MOTION**

OVATION CREDIT SERVICES, INC.,
a Florida Profit Corporation, TERRY D.
CORDELL, individually, and AMY
MYERS, individually,

     Defendants.

_____/

## DEFENDANTS OVATION CREDIT SERVICES, INC., TERRY D. CORDELL, AND AMY MYERS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56, M.D. Fla. Local Rule 3.01, this Court's Scheduling Order and Referral to Mediation dated July 31, 2018 (Doc. 23), and the Court's Orders extending the filing deadlines for dispositive motions (Docs. 46, 53), Defendants, Ovation Credit Services, Inc. ("Ovation"), Terry D. Cordell ("Cordell"), and Amy Myers ("Myers") (collectively, the "Defendants"), move for an Order granting partial summary judgment in their favor for those respective periods of employment where Plaintiffs were exempt from the Fair Labor Standards Act's overtime requirements pursuant to 29 U.S.C. § 207(i). As grounds, the Defendants state:

1. On March 16, 2018, Plaintiff, Vernon Diggs ("Diggs") filed his Complaint and Demand for Jury Trial (Doc. 1) alleging that, while employed as a "non-exempt inside sales representative," Defendants failed to appropriately pay him overtime in violation of the

Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 ("FLSA"). Doc. 1 at ¶¶ 30-32, 35, 37. Diggs further alleges in his Complaint (without any specificity) that Defendants also violated the FLSA by not paying him at least the federal minimum wage for all hours worked. *Id.* at ¶¶ 34-35, 48-49.

2.     Between March 26, 2018 and July 3, 2018, Diggs periodically filed Consents to Join this litigation signed by Kimberly Gosse ("Gosse"), Gabor Szabo ("Szabo"), Daniel Wessels ("Wessels"), Michael Robinson ("Robinson"), and Ernest Jackson ("Jackson") (collectively, the "Opt-in Plaintiffs"). *See* Doc. 7-1; Doc. 8-1; Doc. 11-1; Doc. 15-1; Doc 21-1. Diggs and the Opt-in Plaintiffs are referred to collectively herein as "Plaintiffs."

3.     Defendants timely filed an Answer and Affirmative and Other Defenses to Plaintiff's Complaint (Doc. 12) on April 20, 2018 asserting, *inter alia,* that Plaintiffs, as employees of a retail or service establishment as defined in 29 U.S.C. § 207(i), were exempt from the FLSA's overtime provisions. Doc. 12 at p. 3, ¶ A.

4.     Construing the pleadings on file in this case, discovery responses, depositions, affidavits, and other summary judgment evidence in support of this Motion most favorably to the Plaintiffs, no genuine issue of material fact exists concerning the applicability of Section 7(i) Plaintiffs' overtime claims during certain periods. Specifically, the undisputed evidence shows that Plaintiffs, to varying degrees, are exempt from overtime compensation under Section 7(i) of the FLSA because (1) Ovation is a retail/service establishment, (2) Plaintiffs' regular rates of pay were at least one and one-half times the federal minimum wage during the exempt periods, and (3) more than half of the Plaintiffs' compensation for the applicable representative period was from commissions. Further, this Motion and the accompanying

Memorandum of Law will show that the undisputed evidence establishes that Plaintiffs were paid at least the federal minimum wage for all hours worked. Accordingly, Defendants are entitled to partial summary judgment as a matter of law.

WHEREFORE, Defendants respectfully request that the Court enter an Order granting summary judgment in their favor and against Plaintiffs (1) on all claims for overtime compensation purportedly owed during periods of employment covered by the § 7(i) exemption, and (2) on all claims for underpayment and/or non-payment of the federal minimum wage. Defendants further request that the Court award Defendants their costs and attorney's fees, and grant any such other relief as the Court deems just and proper.

## MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

## I.  STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### *Ovation and its Business*

1.      Ovation is a retail credit repair, credit education, and credit monitoring service provider. Doc. 31-1 at ¶ 3; Cordell Dep. at 33:11-17 (Jan. 23, 2019).

2.      Ovation sells products and services designed to help consumers resolve inaccuracies on their credit report, as well as services that help consumers optimize their individual credit profiles and educational services relative to consumer credit and credit use. Doc. 31-1 at ¶ 3; Cordell Dep. at 33:11-17; *see also* Doc. 25-12.

---

[1] Because the alleged facts presented here must be viewed by the Court in the light most favorable to Plaintiff and the Opt-in Plaintiffs, they are recited for the limited purposes of summary judgment only. By reciting these facts, Defendants do not adopt, accept as true or intend to admit to any fact not already admitted in the pleadings. References in this Statement of Undisputed Material Facts to items filed in the Court's docket for the above-captioned case are abbreviated as "Doc. ___," followed by the appropriate docket number. References to deposition transcripts are abbreviated as follows: [Deponent Name] Dep. at ___ followed by the appropriate page and line numbers, and if applicable, the deposition exhibit is referenced "Ex." followed by the exhibit number. References to sworn Declarations are abbreviated as follows: [Declarant Name] Dec. ¶ ___, followed by the appropriate paragraph number(s). Defendants will file separately the declaration and transcripts and exhibits from the depositions of Diggs, Gosse, Jackson, Robinson, Szabo, Wessels, and Cordell.

3.     Ovation sells its products and services to individual consumers via inbound and outbound telephone calls made by Credit Analysts. Diggs Dep. at 20:17-22 (Oct. 16, 2018); Gosse Dep. at 15:8 to 16:2, 16:23 to 17:1 (Oct. 16, 2018); Jackson Dep. at 25:21 to 26:11 (Oct. 17, 2018); Robinson Dep. at 15:23 to 16:22, 17:1-10 (Oct. 17, 2018); Szabo Dep. at 35:14-21, 36:7-10, 51:13-24 (Oct. 16, 2018); Wessels Dep. at 11:6-11 (Oct. 17, 2018). Ovation does not "cold call" any consumer. Cordell Dep. at 39:24 to 40:17.

4.     Rather, Ovation advertises its services and products to the general public via the internet. Doc. 31-1 at ¶ 3; Cordell Dep. at 33:18-23; *see also* Doc. 25-11. Ovation maintains an internet website that allows consumers to locate Ovation, review the services Ovation provides, and complete a form on Ovation's website asking to consult with an Ovation representative. Cordell Dep. at 33:18-23, 39:24 to 41:12; *see also* Doc. 25-11. Alternatively, consumers initiate contact with Ovation via a telephone number listed on Ovation's website. Cordell Dep. at 33:18-23, 41:7-11; Doc. 25-11.

5.     Ovation also obtains customer referrals from mortgage lenders and other entities in the lending space who have partnered with Ovation. Cordell Dep. at 33:18 to 34:11; Diggs Dep. at 20:23 to 21:9, 21:18 to 22:10; Gosse Dep. 17:2-11. In those instances, customers – whose low credit scores prevented them from working with the lending partner – would elect to be contacted by Ovation, specifically, for credit repair and/or credit education services. Cordell Dep. at 34:3-11, 39:24 to 40:17, 42:8 to 43:9.

6.     All of Ovation's contact with consumers is direct regardless of whether the customer is referred to Ovation or whether the customer locates Ovation via its website. Cordell Dep. at 38:3-11; Gosse Dep. at 47:6-21; Wessels Dep. at 10:18-21. Specifically,

Credit Analysts speak with individual customers directly about their respective credit reports, any negative items on their report, what credit-related products and services Ovation offers, what is involved in those products and services, and how the individual consumer could purchase Ovation's services. Cordell Dep. at 25:7-16; Diggs Dep. at 22:21 to 23:10, 68:14 to 69:14; Gosse Dep. at 16:13-22, 17:12-16, 46:1 to 47:5; Jackson Dep. at 34:16 to 35:8, 77:11 to 78:5; Szabo Dep. at 49:13 to 50:13; *see also* Gosse Dep. Ex. 2. Ovation does not provide credit consolidation or credit settlement services. Szabo Dep. at 50:14-18.

7.      Customers pay for Ovation's products and services via personal credit or debit card. Diggs Dep. at 23:11-22; Gosse Dep. at 27:11-16; Jackson Dep. at 35:9-20; Robinson Dep. at 16:23-25; Wessels Dep. at 11:12-14.

8.      Ovation's customers are end-users of Ovation's products and services and did not resell the services and products. Doc. 31-1 at ¶ 3. Ovation's goods and services are for each customer's personal use. *Id.*; *see also* Doc. 25-11.

9.      Ovation's goods and services are neither sold to commercial entities (whether directly by Ovation or via resale by Ovation's customers), nor are they used for any broader commercial or secondary purpose. Doc. 31-1 at ¶ 3; Gosse Dep. at 16:3-5; Szabo Dep. at 51:13-19. Accordingly, more than 75% of Ovation's annual dollar volume of sales of its products and services are not for resale. Doc. 31-1 at ¶ 3.

10.     Ovation's does not engage in any manufacturing process as part of its operation. *Id.*

### Ovation's Compensation of Credit Analysts

11.     At all relevant times, Ovation paid its Credit Analysts an hourly wage plus

commissions based on the number of products and/or services the Credit Analyst sells to individual consumers over a two-week payroll period. Doc. 31-1 at ¶ 13; Doc. 31-3 at ¶ 6; Cordell Dep. at 43:16-22; Gosse Dep. at 35:9-11; Jackson Dep. at 40:8-13, 52:21-24; Robinson Dep. at 25:2-4, 26:7-9 (noting that Ovation paid commissions on a biweekly basis); Szabo Dep. at 37:4-8, 13-16.

12.     A Credit Analyst's commissions are based on the number of confirmed sales he or she makes over a two-week payroll period. Doc. 31-1 at ¶ 13; Doc. 31-3 at ¶ 6. The amount of a Credit Analyst's commission increases with each sales tier a Credit Analyst reaches, with tiers thresholds existing at 21, 35, and (now) 46 sales. *Id.* at ¶ 13; Doc. 31-4 at ¶ 4; Cordell Dep. at 74:18 to 75:17; Jackson Dep. at 63:10-22; Szabo Dep. at 36:11 to 37:3, 37:24 to 38:1. Before 2018,[2] the minimum number of sales a Credit Analyst had to make over a two-week period before earning commissions was 21.[3] Doc. 31-1 at ¶ 13; Doc. 31-2 at ¶ 4; Doc. 31-3 at ¶ 6; Doc. 31-4 at ¶ 4; Diggs Dep. at 57:15 to 58:2; Gosse Dep. at 37:20 to 38:3; Jackson Dep. at 46:8-20; Robinson Dep. at 26:20 to 27:3; Szabo Dep. at 37:17-23; Wessels Dep. at 13:11-15.

13.     Ovation has paid its Credit Analysts overtime compensation when those employees worked more than 40 hours in a workweek. Cordell Dep. at 48:2-17; Diggs Dep. at 55:3-7; Gosse Dep. at 39:11-20.

14.     Ovation has never had a company policy or practice of allowing Credit

---

[2] Under Ovation's commission plan, Credit Analysts currently begin earning commissions after making 16 confirmed sales over a two-week period. Doc. 31-1 at ¶ 13.

[3] Ovation implements corrective action against a Credit Analyst not meeting Ovation's minimum sales goal. Doc. 31-3 at ¶ 7; Cordell Dep. at 74:14-17, 75:23 to 76:12. Because that process involves verbal counseling, coaching and written warnings, it takes several pay periods to complete. Doc. 31-3 at ¶ 7; Cordell Dep. at 75:23 to 76:24.Ovation does not reprimand or terminate Credit Analysts for not reaching secondary sales goal tiers. Doc. 31-3 at ¶ 7; Diggs Dep. at 58:3-10, 59:22-24; Jackson Dep. at 64:7-14.

Analysts to work off the clock to reach sales goals.[4] Doc. 31-1 at ¶ 15; Doc. 31-2 at ¶¶ 6-7, 11; Doc. 31-3 at ¶¶ 8-9; Doc. 31-4 at ¶¶ 7-8; *see also* Jackson Dep. at 49:9-11.

### *Plaintiffs' Employment with Ovation*

15.     Diggs worked for Ovation as a Credit Analyst from August 9, 2016 through March 26, 2017. Doc. 31-1 at ¶ 6; Diggs Dep. at 24:18 to 25:1, 73:19 to 74:4. On March 26, 2017, Ovation promoted Diggs to the position of Sales Manager and placed him over a sales team consisting of various Credit Analysts, including, among others, Robinson. Doc. 31-1 at ¶ 6; Diggs Dep. at 25:10-20, 26:8-19. Diggs resigned from his employment as a Sales Manager with Ovation on November 2, 2017. Doc. 31-1 at ¶ 6; Diggs Dep. at 26:8-19.

16.     Like Diggs, Ovation employed Gosse as a Credit Analyst from June 1, 2015 until December 19, 2016 before promoting her to Sales Manager. Doc. 31-1 at ¶ 7; Gosse Dep. at 7:19 to 8:3, 14:5-20, 16:9-12, 18:6-11, 18:19 to 19:12, 28:6-10. As a Sales Manager, Gosse was responsible for supervising Diggs, Jackson, and Robinson, among others. Doc. 31-1 at ¶ 7; Gosse Dep. at 30:3-5, 17-19; Robinson Dep. at 17:18 to 18:1. Gosse worked for Ovation as a Sales Manager until January 15, 2018 when Ovation terminated her employment for taking a sales call on an unrecorded line. Doc. 31-1 at ¶ 7; Gosse Dep. at 28:11-14, 32:24 to 33:20, 34:7 to 35:4.

17.     Jackson also previously worked for Ovation as a Credit Analyst. Doc. 31-1 at ¶ 9; Jackson Dep. at 25:13-20. Ovation employed Jackson in that capacity from January 10, 2017 through March 23, 2018. Doc. 31-1 at ¶ 9. Gosse, among others, supervised Jackson during his time as a Credit Analyst with Ovation. *Id.*; *see also* Gosse Dep. at 30:17-19;

---

[4] Indeed, Gosse has testified that no one with Ovation told her that she had to work off the clock. Gosse Dep. 40:7 to 41:1.

Jackson Dep. at 28:25 to 29:2.

18.     Ovation employed Robinson as a Credit Analyst from November 16, 2015 through December 2, 2017. Doc. 31-1 at ¶ 8; Robinson Dep. at 9:18-20, 17:11-17. Diggs and Gosse were two of Robinson's supervisors while he was employed by Ovation as a Credit Analyst.[5] Id. at 17:18 to 18:1.

19.     Szabo also worked for Ovation as a Credit Analyst. Doc. 31-1 at ¶ 10; Szabo Dep. at 30:22-24, 33:20-24. Ovation employed Szabo from April 11, 2017 to November 6, 2017. Doc. 31-1 at ¶ 10; Szabo Dep. at 34:5-7, 72:14-21. Szabo had various issues including, among other things, attendance problems that caused him to leave work early, be tardy, and/or absent from work at Ovation on numerous occasions. Doc. 31-1 at ¶ 10. Diggs, among others, supervised Szabo during his employment with Ovation. Szabo Dep. at 34:8-18

20.     Ovation employed Wessels as a Credit Analyst briefly from January 10, 2017 through July 5, 2017. Doc. 31-1 at ¶ 11; Wessels Dep. at 8:1-9, 10:15-21, 19:11-14.

21.     Plaintiffs have no documentation of hours they worked for Ovation. Diggs Dep. at 8:8 to 9:13, 12:4-17; Gosse Dep. at 8:4-7; Jackson Dep. at 12:5-10; Robinson Dep. at 9:21 to 11:3; Szabo Dep. at 16:22-25. Nonetheless, Plaintiffs assert that they worked an average of 45 hours per workweek while employed by Ovation. See Doc. 14-1 at ¶ 6(c); Gosse Dep. Ex. 1 at pp. 3-4.

22.     Ovation paid Diggs, Jackson, Robinson, Szabo, and Wessels a standard hourly

---

[5] Diggs and Gosse claimed during their depositions that they were unaware of any subordinates working off the clock during their time as Sales Managers. Diggs Dep. at 85:3-17 (testifying that he did not know if anyone he supervised worked while not logged in to Ovation's timekeeping system); Gosse Dep. at 29:20 to 30:1 (testifying that she was unaware and had no information that anyone on her sales team was working off the clock). However, Jackson testified that he would tell Gosse before working off the clock. Jackson Dep. at 60:22 to 62:9. Similarly, Robinson informed Diggs and/or Gosse each time he was going to allegedly work off the clock. Robinson Dep. at 22:10 to 23:22.

rate of $11.50 per hour during the relevant period. Doc. 14-1 at ¶ 5; Diggs Dep. at 50:15-19; Jackson Dep. at 52:25 to 53:1; Robinson Dep. at 25:2-9, 33:11-15; Szabo Dep. at 37:9-12, 72:22-25; Wessels Dep. at 11:22-25, 33:12-23; Terry D. Cordell Dec. at ¶¶ 9, 15, 19, 22, 25 (May 21, 2019). Ovation paid Gosse a standard hourly rate of $12.50 at all material times. Gosse Dep. at 35:12-22; Cordell Dec. at ¶ 12.

23.     Over the period of August 29, 2016 through October 9, 2016, 52% of Diggs' compensation constituted commissions earned as a result of his sale of Ovation's products and/or services to its customers. Cordell Dec. at ¶ 10; Cordell Dec. Ex. B at p. 1. During each of the periods January 2, 2017 through February 12, 2017 and February 13, 2017 through March 26, 2017, 55% Diggs' compensation was from commissions on Ovation goods and/or service. Cordell Dec. at ¶ 10; Cordell Dec. Ex. B at p. 1.

24.     Similarly, more than 50% of Gosse's compensation came from commissions from the sale of Ovation goods and/or services during the periods of March 28, 2016 through May 8, 2016 (55%), May 9, 2016 through June 19, 2016 (56%), June 20, 2016 through July 31, 2016 (51%), August 1, 2016 through September 11, 2016 (64%), September 12, 2016 through October 23, 2016 (58%), and October 24, 2016 through December 4, 2016 (57%). Cordell Dec. at ¶ 13; Cordell Dec. Ex. B at pp. 2-3.

25.     For the period of March 13, 2017 through April 23, 2017, 51% of Jackson's compensation was from commissions earned from his sale of goods and/or services to Ovation's customers. Cordell Dec. at ¶ 16; Cordell Dec. Ex. B at p. 4.

26.     During the period of January 2, 2017 through February 12, 2017, more than 50% of Robinson's compensation constituted commissions. Cordell Dec. at ¶ 20; Cordell

Dec. Ex. B at pp. 5-6. Further, for the period of May 8, 2017 through June 21, 2017, 52% of Robinson's compensation was from commissions on the sale of Ovation products and/or services. Cordell Dec. at ¶ 20; Cordell Dec. Ex. B at pp. 5-6.

27.     More than 50% of Szabo's compensation constituted commissions for the periods of April 24, 2017 through June 4, 2017 (53%) and June 5, 2017 through July 16, 2017 (59%). Cordell Dec. at ¶ 23; Cordell Dec. Ex. B at p. 7.

28.     Plaintiffs' regular rates of pay exceeded one and one-half times the federal minimum hourly wage (or $10.88 per hour) during each of the relevant representative periods. Doc. 31-1 at ¶ 12; Cordell Dec. at ¶¶ 11, 14, 17, 21, 24; Cordell Dec. Exs. A-C; Pl.'s Am. Initial Disclosures at Ex. A, pp. 2-7 (Mar. 1, 2019).

29.     Ovation paid Plaintiffs at least the federal minimum wage of $7.25 per hour worked during their employment with Ovation. Cordell Dec. at ¶¶ 11, 14, 18, 21, 24, 26; Cordell Dec. Exs. A-C; Pl.'s Am. Initial Disclosures at Ex. A, pp. 2-7.

## II.  LEGAL ARGUMENT

### A.  <u>Standard for Summary Judgment</u>

Fed. R. Civ. P. 56 provides in relevant part that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings and come forward with specific evidence that there is a genuine issue of fact for trial; the non-moving party must offer more than mere allegations or legal conclusions. *Allen v. Bd. of Pub. Educ. for Bibb Co.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (internal citations omitted).

Significantly, the mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## B.   Plaintiffs' Claims are Barred, in Whole or Part, by Section 7(i) of the FLSA

Whether an employee is exempt under the FLSA is a legal question that can be resolved on summary judgment. *Paneto v. Motor Car Concepts II, Inc.*, No. 606CV-828-ORL-18KRS, 2007 WL 328730, at *2 (M.D. Fla. Jan. 31, 2007) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713-14 (1986)). While it remains an employer's burden to establish that an employee is covered by an FLSA exemption, the United States Supreme Court has rejected the proposition that an exemption is construed narrowly against the employer. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *White v. Winn Dixie*, 741 Fed. Appx. 649, 662 (11th Cir. 2018). Instead, FLSA exemptions should be given a "fair (rather than a 'narrow') interpretation." *Navarro*, 138 S. Ct. at 1142.

Here, Plaintiffs and the putative class members are exempt from the FLSA's overtime requirements pursuant to 29 U.S.C. § 207(i) during certain periods. The 7(i) exemption is applicable to retail or service establishment employees who are paid, at least in part, on a commission basis.[6] *See* 29 U.S.C. § 207(i). To qualify for the 7(i) exemption, three criteria must be met: (1) the employer must be a retail or service establishment; (2) the employee must receive more than half of his or her compensation from commissions during the

---

[6] Importantly, the § 7(i) exemption differs from other FLSA exemptions because it is not based on the employee's job duties; rather, it is based on the pay an employee receives and the employer's status as a retail or service establishment. *Compare* 29 U.S.C. § 207(i) *with* 29 U.S.C. § 213(a)(1). Moreover, unlike the FLSA's white-collar exemptions, exemption under § 7(i) is not static; it can fluctuate periodically depending on an employee's compensation. *See, e.g., Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 895-96 (S.D. Ohio 2003) (granting summary judgment based on § 7(i) for pay periods where more than 50% of employees' compensation was from commissions).

representative period; and (3) the employee's regular rate of pay must exceed one and one-half times the minimum wage. 29 U.S.C § 207(i); 29 C.F.R. §§ 779.410 *et seq.*

### 1.   Ovation is a Retail or Service Establishment under the FLSA

"[A] 'retail or service establishment' is defined as 'an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry.'" *Reich v. Cruises Only, Inc.*, No. 95-660-CIV-ORL-19, 1997 WL 1507504, at *2 (M.D. Fla. June 5, 1997); *see also* 29 C.F.R. § 779.411. Further, the business "[m]ust engage in the making of sales of goods or services." 29 C.F.R. § 779.313; *see also* U.S. Dep't of Labor, Wage and Hour Div. ("DOL") Opinion Letter FLSA2018-21, 2018 WL 4562931 (Aug. 28, 2018). Simply, a retail or service establishment must have a "retail concept." *Wells v. TaxMasters, Inc.*, No. 4:10-CV-2373, 2012 WL 4214712, at *5 (S.D. Tex. Sept. 18, 2012) (citing 29 C.F.R. § 779.316); *Reich*, 1997 WL 1507504, at *3. Importantly, "[w]hether an establishment is a 'retail establishment' is a determination made on a case-by-case basis and is extremely dependent upon the functioning and structure of that establishment." *La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d 1035, 1044 (C.D. Cal. 2010).

#### a.   Ovation engaged in retail sales in a recognized industry

The Secretary of Labor's interpretive regulations provide that "the term 'retail or service establishment' as used in the Act does not encompass establishments in industries lacking a 'retail concept.'" 29 C.F.R. § 779.316. The regulations further identify certain

establishments that purportedly lack a "retail concept."[7] *See* 29 C.F.R. § 779.17. Included in

that list are credit companies, credit agencies, and finance companies. *Id.* However, the

regulations also make clear that determination of what is recognized as retail in a particular

industry is not static; it involves consideration of "the well-settled habits of business,

traditional understanding and common knowledge." 29 C.F.R. § 779.324. Thus, assessment

of an industry's history, its evolution, and a business's adaptive efforts is appropriate in

assessing whether a "retail concept" in that industry exists.

Ovation, as a purveyor of credit repair, credit education, and credit monitoring

services and products, does not fit neatly into any traditional industry establishment

identified in § 779.317.[8] It is not a finance or credit company akin to the lending institutions

contemplated by the United States Supreme Court in *Mitchell v. Kentucky Finance Company,*

*Inc.*, 79 S. Ct. 756, 757, 759 (1959). Ovation is not a credit rating agency assessing

information and assigning credit ratings to any person or entity or otherwise providing

---

[7] Courts have applied varying degrees of deference to § 779.317. *Rodriguez v. Home Heroes, LLC*, 8:13-cv-2711-T-26AEP, 2015 WL 668009, at *6 (M.D. Fla. Feb. 17, 2015). For example, in *Reich*, the district court applied the arbitrary and capricious test to determine whether § 779.317 represented a reasonable construction of the FLSA. *See* 1997 WL 1507504 at *3. The court concluded that it did not, as there was no rational basis for the Secretary of Labor to have designated all travel agencies as lacking a "retail concept" especially when the defendant travel company satisfied § 779.318's criteria for a retail or service establishment. *See id.* at *3, *5. Other federal courts have rejected § 779.317 under similar circumstances. *Rodriguez*, 2015 WL 668009 at *6, n. 54 (collecting cases); *see also Martin v. Refrigeration Sch., Inc.*, 986 F.2d 3, 7, n.2 (9th Cir. 1992) (noting that there appear to be "no generating principles" or "cohesive criteria" underlying the distinction between the businesses that are considered retail establishments as listed in § 779.320 and those that are not as listed in § 779.317); *Wells*, 2012 WL 4214712 at *5 (recognizing that the Fifth Circuit has declined to follow Section 779.317 and that "[t]here is not magic in placing a business in a category and then asserting that since it is in that category, it is like all businesses with which it has been placed.") (internal citation omitted). As discussed herein, Ovation satisfies all of § 779.318's criteria; therefore, strict application of § 779.317 to Ovation's business is neither warranted nor determinative of Ovation's status as a retail or service establishment under the FLSA. *See id.*; *see also Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 201-02 (1966) (rejecting exclusive use of an industry usage test to make retail concept determination).

[8] This is likely because the regulations consist of an "antiquated list" of businesses "seldom found in twenty-first century America" such as "auto courts, automobile laundries, coal yards, dance halls, hosiery shops, millinery shops, public baths, scalp-treatment establishments, and shoeshine parlors." *Haskins v. VIP Wireless, LLC 300*, No. 09-754, 2010 WL 3938255, at * 3, n. 4 (W.D. Pa. Oct. 5, 2010).

investment information. And though similar in its use of a call center to make outbound calls, Ovation is not a debt settlement service offering assistance in reducing unsecured debt like the business at issue in *Parker v. ABC Debt Relief, Ltd. Co.*, No. 3:10-CV-1332-P, 2013 WL 371573, at *10 (N.D. Tex. Jan. 28, 2013).[9]

Instead, Ovation's business is analogous to those establishments providing general repair services for the public that the Secretary of Labor has deemed having a "retail concept" like automobile repair shops, fur repair shops, refrigerator service repair shop, shoe repair shops, and watch, clock, and jewelry repair establishments. *See* 29 C.F.R. §§ 779.318-779.320. Accordingly, because Ovation's business constitutes retail sales in the recognized "repair" industry, application of the § 7(i) exemption to Ovation's employees is appropriate.

### b. Ovation is an establishment with a retail concept

A business with a "retail concept" typically exhibits the following characteristics: it (1) "sells goods or services to the general public," (2) "serves the everyday needs of the community," (3) "is at the very end of the stream of distribution," (4) disposes its products in "small quantities," and (5) "does not take part in any manufacturing process."[10] 29 C.F.R. § 779.318(a); DOL Opinion Letter FLSA2018-21, 2018 WL 4562931. Further, an establishment with a "retail concept" is open to the general public. *Reich*, 1997 WL 1507504

---

[9] Indeed, *Parker* is distinguishable from the present case because, among other reasons discussed herein, (a) Ovation's business is open to the general public via physical, telephonic, and virtual/online platforms, and (b) Ovation's credit repair and credit education is precisely the type of service(s) that are utilized by the general public in their daily living. For example, unlike the seemingly cold and random calls to clients in *Parker*, Ovation only contacts prospective clients based on the clients' initial indication of interest in Ovation's products and/or services. Thus, the general public has exhibited a consistent and growing interest in Ovation's credit repair and credit education services as part of its daily living.

[10] Importantly, "[t]he legislative history of the section 13(a)(2) exemption for certain retail or service establishments shows that Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." 29 C.F.R. § 779.318(b) (recognizing the difficulty in drawing a "precise line between such articles and those which can never be sold at retail").

at *3 (citing 29 C.F.R. § 779.319).

Applying these criteria in the modern business space, the DOL recently issued an opinion letter advising that a company that "sells a technology platform to merchants that enables online and retail merchants to accept credit card payments from their customers from a mobile device, online, or in-person" is a "retail or service establishment" for purposes of § 7(i).[11] *See* 2018 WL 4562931, at *1. In reaching that decision, the DOL began by addressing the factors enumerated in § 779.318(a). Namely, the DOL found that the technology business met all of § 779.318(a)'s criteria because "your client sells its platform to a variety of purchasers, the platform serves their everyday needs, the platform is not distributed further once sold, and your client does not sell large quantities of the platform to any single customer." *Id.* at *1. The DOL also found that the business should be considered a retail or service establishment since it did not engage in wholesale sales, and its customer-specific products could not be resold. *Id.* at *2. Critically, the DOL recognized that the business was not disqualified from being a retail or service establishment because its sales were primarily online and predominantly to commercial entities. *Id.* Like the technology platform provider in the DOL's letter, Ovation meets the criteria of a retail or service establishment.

As explained above, Ovation sells its credit repair products and services directly to the general consuming public via its Credit Analysts. Numerous federal courts have recognized that businesses like Ovation, which advertise to the public and are engaged in sales directly to consumers via call centers, "sell their goods or services to the general

---

[11] The Eleventh Circuit Court of Appeals has recognized that DOL opinion letters may provide guidance and are entitled to persuasive deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Rodriguez*, 2015 WL 6680009, at *7 (citing *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009)).

public." *See, e.g., Wells*, 2012 WL 4214712 at *5 (finding tax consulting and tax preparation business that sold it services directly to consumers via a call center "[c]ertainly … sold their services to the general public."); *Selz v. Investools, Inc.*, No. 2:09-CV-1042 TS, 2011 WL 285801, at *6 (D. Utah Jan. 27, 2011) (holding that business selling investment education products to individual consumers through a call-center sold goods and services to the general public); *La Parne*, 714 F. Supp. 2d at 1042-43 (finding that business advertising sale of precious metals to public via television and public website and then selling precious metals directly to individual consumers over the telephone satisfied the "sells goods to the general public" requirement). Ovation does not participate in any manufacturing process, nor does it sell its products in bulk.

Moreover, Ovation's "retail concept" is evident by the way its business and services are open and available to the general public through the internet and by telephone. *See* 29 C.F.R. § 779.39 (recognizing that a business "is available and open to the general public even if it receives all of its orders on the telephone"); *Charlot v. Ecolab, Inc.*, 136 F. Supp. 3d 433, 460 (E.D.N.Y. 2015) (finding that defendant's call center was a "fixed, permanent establishment that is available, and sells goods and services, to the general public, and holding that a retail or service establishment may be accessible to the public by telephone, internet, or other means especially since "the connection between a fixed establishment and the customer is far easier to achieve given today's cellular forms of technology and other others of communication."); *Selz*, 2011 WL 285801, at *6 (noting that "case law does not require a physical location accessed by the public" for a retail concept to exist); DOL Opinion Letter FLSA2018-21, 2018 WL 4562931, at *2 (same).

16

Further, Ovation's business serves the everyday needs of the community, *i.e.*, the "'basic' or 'integral' needs of members in the community." *La Parne*, 714 F. Supp. 2d at 1044 (recognizing consumer collection and investment of precious metals as integral, basic needs of members of the community); *Selz*, 2011 WL 285801, at *7 (finding sales of investment education products for consumer personal funds met the "basic need of members of the community in today's world"). Importantly, "[i]t is not the case that an establishment must provide a product or service used by each member of the community on [a] daily basis for it to serve the everyday needs of the community."[12] *Wells*, 2012 WL 4214712 at *5-*6 (recognizing that periodic tax services are no less retail in nature than automobile, radio, and refrigerator sales or related incidental services); *see also Reich*, 1997 WL 1507504, at *4. Consistent with the foregoing, Ovation satisfies this aspect of the "retail concept" by providing its products and services to those in the community with credit-related needs, *i.e.*, low credit scores prevent financing or credit issues relative to investment opportunities who have specifically requested (directly or indirectly) information about Ovation's help.

Finally, Ovation is at the end of the stream of distribution and its products and services are not for resale. Under the regulations, "[t]he common meaning of 'resale' is the act of 'selling again.' A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold." DOL Opinion Letter FLSA2018-21, 2018 WL 4562931, at *2 (quoting 29 C.F.R. § 779.31). Ovation's products and services

---

[12] As Judge Fawsett recognized in *Reich*, "[t]he list provided in the regulations of businesses which are recognized as retail reflects that such narrow interpretation would be incorrect. This list includes ... cemeteries, coal yards, crematories, ... embalming establishments, funeral homes, fur repair and storage shops, ... taxidermists, ... and undertakers, none of which would be used daily by everyone in the community." 1997 WL 1507504, at *4 (suggesting that, though vacations are not an everyday occurrence, consumers would likely use a travel agent more often than a taxidermist or crematorium).

are sold to individual customers relative to those customers' personal credit; thus, Ovation's wares cannot be resold. "The fact that [defendant's] services are not for resale … indicates that the services are at the end of the stream of distribution." *Reich*, 1997 WL 1507504, at *4.

Ovation's credit repair, credit monitoring, and credit education services are "for the comfort and convenience of [the] public in the course of its daily living." *See* 29 C.F.R. § 779.318(a). Because its services possess the requisite "retail concept", Ovation qualifies as a retail or service establishment for purposes of the Section 7(i) exemption.

### 2. More than Half of Plaintiffs' Compensation was from a Bona Fide Commission Plan During Certain Representative Periods

Next, to qualify for § 7(i)'s retail-service exemption, (1) more than half of the Plaintiffs' compensation for a representative period must consist of commissions on goods or services, and (2) those commissions must be derived from a bona fide commission plan. *See* 29 U.S.C. § 207(i); 29 C.F.R. § 779.410; *Lee v. Ethan Allen Retail, Inc.*, 651 F. Supp. 2d 1361, 1364 (N.D. Ga. 2009). Both elements are satisfied here.

#### a. Plaintiffs' commissions were derived from a bona fide commission plan

Section 7(i) provides that "[i]n determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee." 29 U.S.C. § 207(i). Section 7(i) does not elaborate on what constitutes a "bona fide commission rate." Instead, courts look to the Secretary of Labor's interpretive regulations for guidance. *See Crawford v. Saks & Co.*, No. H-14-3665, 2016 WL 3090781, at *4 (S.D. Tex. June 2, 2016).

DOL regulations recognize that employees of retail or service establishments can be

compensated in a variety of ways. *See* 29 C.F.R. § 779.413. Pertinent here, those compensation methods include a "quota bonus," which the DOL defines as "similar to [salary plus commission] except that the commission payment is paid on sales over and above a predetermined sales quota." *Id*. at § 779.413(a)(3). "By definition, each of [§ 779.413(a)'s] compensation plans, except for the 'straight salary or hourly rate,' qualify as 'bona fide commission plans' under § 207(i)." [13] *Bowman v. Builder's Cabinet Supply Co.*, No. 04-201-DLB, 2006 WL 2460817, at *7 (E.D. Ky. Aug. 23, 2006); *see also Winkles v. Am. Ribbon & Toner Co., Inc.*, No. 06-061266-CIV-DIMITROULEAS, 2007 WL 9701039, at *4 (S.D. Fla. Nov. 15, 2007) (recognizing that a "quota bonus" method of compensation qualifies for the commission sales exemption under appropriate facts and circumstances); *Viciedo*, 246 F. Supp. 2d at 896 (same).

A quota bonus commission plan based on sales made above predetermined thresholds is at issue here. As noted above, Ovation paid Plaintiffs a standard hourly rate between $11.50 and $12.50 per hour.[14] Ovation also paid Plaintiffs a fluctuating amount of

---

[13] Conversely, federal regulations provide two examples of plans that do not qualify as "bona fide" commission rates. First, a commission rate is not bona fide where "the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or the guarantee)." 29 C.F.R. § 779.416(c); *but see Winkles*, 2007 WL 9701039, at *6 (noting that "[a]n employer should not be punished for utilizing a commission scheme that is favorable to employees by allowing them some predictability in their pay checks."). Second, an employer's commission plan is not bona fide where "the employee receives a regular payment constituting nearly his entire earnings which is expressed in terms of a percentage of the sales which the establishment or department can always be expected to make with only a slight addition to his wages based upon a greatly reduced percentage applied to the sales above the expected quota." 29 C.F.R. § 779.416(c). Here, neither of the DOL's foregoing examples is applicable. Plaintiffs did not always earn the same fixed amount: rather, their earnings fluctuated based on the amount of hours they worked and sales they made. Likewise, Plaintiffs did not receive a "regular payment … expressed in terms of a percentage of sales." Instead, Ovation paid Plaintiffs a standard rate for each hour worked regardless of the amount of sales made. Plaintiffs' earnings then could be increased based on Plaintiffs' efforts and the number of sales above Ovation's biweekly quota.

[14] Importantly, Ovation has paid its Credit Analysts overtime compensation when its employees have worked more than 40 hours in a workweek. *See* Doc. 31-1 at ¶¶ 6-10, 16-17. Thus, it can hardly be argued that Ovation's commission plan was established in bad faith or in an attempt to avoid paying overtime compensation

commissions. Those commission payments were linked to the number of products and/or services Plaintiffs sold over a two-week payroll period. More precisely, Ovation's commission payments were dependent on Plaintiffs reaching and exceeding set sales tiers, the lowest threshold being 21 sales in a payroll period. Through this structure, Ovation tied Plaintiffs' commission to the value they created through their labor, thereby providing an incentive for Plaintiffs to make more sales to earn more compensation. Accordingly, because Plaintiffs' earned commissions within the meaning of § 7(i) pursuant to a bona fide commission rate, application of the retail or service exemption is applicable.

### b. More than half of Plaintiffs' compensation for certain representative period longer than one month was from commissions

Whether compensation representing commissions constitutes most of an employee's pay, so as to satisfy the last requirement of the 7(i) exemption, must be determined by assessing the employee's compensation during a "representative period" of not less than one month and no greater than one year. 29 C.F.R. § 779.417(a), (c). According to DOL regulations, "[a] representative period within the meaning of [the Section 7(i)] exemption may be described generally as a period which typifies the total characteristics of an employee's earning pattern … with respect to fluctuations of the proportion of commission earnings to his total compensation." *Id.* at § 779.417(a). "To that end, the period must be as recent a period, of sufficient length … to fully and fairly reflect all such factors, as can practicably be used." *Id.*at § 779.417(b).

Here, Defendants have distilled Plaintiffs' respective periods of employment into six-

---

to employees like Plaintiffs. *See Lee*, 651 F. Supp. 2d at 1366-67.

week representative periods.[15] Through that lens, except for Wessels, more than 50% of each of the Plaintiffs' compensation was derived from commissions during the following periods:

- Diggs: August 29, 2016 through October 9, 2016 (52%); January 2, 2017 through February 12, 2017 (55%); and February 13, 2017 through March 26, 2017 (55%).

- Gosse: March 28, 2016 through May 8, 2016 (55%); May 9, 2016 through June 19, 2016 (56%); June 20, 2016 through July 31, 2016 (51%); August 1, 2016 through September 11, 2016 (64%); September 12, 2016 through October 23, 2016 (58%); and October 24, 2016 through December 4, 2016 (57%).

- Jackson: March 13, 2017 through April 23, 2017 (51%).

- Robinson: January 2, 2017 through February 12, 2017 (50.01%); and May 8, 2017 through June 21, 2017 (52%).

- Szabo: April 24, 2017 through June 4, 2017 (53%); and June 5, 2017 through July 16, 2017 (59%).

See Cordell Dec. at Ex. B. Accordingly, 7(i)'s second element is satisfied and summary judgment is warranted for the foregoing representative periods.[16]

---

[15] For purposes of this Motion, and consistent with DOL guidance, Defendants have selected six-week representative periods for determining if each of the Plaintiffs' commissions  sufficiently meet Section 7(i)'s exemption requirements. Defendants have selected this six-week representative period because, given that commissions are calculated over a two week period, it is the shortest possible period of at least one month and thus the most favorable to the Plaintiffs.

[16] To the extent asserted by Plaintiffs, a failure to comply with certain recordkeeping requirements related to the § 7(i) exemption, like pre-designation of the representative period, does not render the exemption unavailable. *Duarte v. Perez*, No. 6:14-cv-2077-Orl-28TBS, 2016 WL 11566245, at *5 (M.D. Fla. Oct. 31, 2016), *report and recommendation adopted by* 2016 WL 11566247 (M.D. Fla. Nov. 22, 2016); *see also Jackson v. Leader's Institute, LLC*, No. 1:14-cv-00193-TWP-DML, 2015 WL 7573228, at *8 (S.D. Ind. Nov. 24, 2015) (recognizing that failure to meet recordkeeping requirements does not invalidate an otherwise available § 7(i) exemption); *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 1994286, at *6 n. 15 (S.D. Tex. Aug. 17, 2005) (same).

### 3. Plaintiffs Earned More than One and One-Half Times the Minimum Wage During Exempt Periods

The final element of the § 7(i) exemption requires that Plaintiffs' regular rate of pay exceed one and one-half times the federal minimum wage during the applicable workweek. 29 U.S.C. § 207(i). The federal minimum wage was $7.25 throughout the duration of each of the Plaintiffs' employment with Ovation. 29 U.S.C. § 206(a)(1). Thus, to be exempt from overtime in any given week under Section 7(i), Plaintiffs' regular rate of pay must exceed $10.88 per hour ($7.25 x 1.5) for that week.

Under applicable regulations, the "regular rate of pay" is "the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed' and 'by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments.'" 29 C.F.R. § 779.419(b). "The regular rate is determined by dividing the employer's total compensation during the workweek by the number of hours worked." *Klinedinst v. Swift Invest., Inc.*, 260 F.3d 1251, 1256 (11th Cir. 2001); *see also* 29 C.F.R. § 778.110(b) (discussing calculation of the regular rate for an employee who is paid an hourly rate and a production bonus).

Here, the parties agree that Ovation paid Diggs, Jackson, Robinson, Szabo, and Wessels a base wage of $11.50 per hour, and that Ovation paid Gosse a base rate of $12.50 per hour. With the addition of commissions, Plaintiffs' respective regular rates of pay during the workweeks in the representative periods identified in section II(B)(2)(b), *supra*, exceeded $10.88 per hour even if Plaintiffs, as they allege, worked 45 hours per week. *See* Cordell Dec. at ¶¶ 11, 14, 17, 21, 24; Cordell Dec. Exs. A-C; *see also* Pl.'s Am. Initial Disclosures at Ex. A, pp. 2-7. Accordingly, Section 7(i)'s third and final factor is satisfied for the relevant

workweeks. Summary judgment in Defendants' favor should therefore be granted as to each of Plaintiffs' workweeks falling within the ambit of Section 7(i)'s overtime exemption.

**C.**   **Plaintiffs' Claims are Barred Because Ovation Paid Plaintiffs the Federal Minimum Wage for all Hours Worked**

In addition to overtime compensation, the FLSA requires employers to pay employees a minimum hourly wage of $7.25 per hour. 29 C.F.R. §206(a). As noted above, Plaintiffs have alleged that Defendants violated Section 206(a) by not paying them at least the federal minimum wage for all hours worked. Doc. 1 at ¶¶ 34-35, 48-49. More precisely, Plaintiffs are claiming (despite admittedly having no evidence other than their own speculation and conjecture) that Defendants did not pay them the federal minimum wage for the five hours of overtime that they purportedly worked per week while employed with Ovation. *See id.*; *see also* Doc. 14-1 at ¶ 6(c); Gosse Dep. Ex. 1 at pp. 3-4; Pl.'s Am. Initial Disclosures at Ex. A, pp. 2-7**.** Stated differently, Plaintiffs allege that they received less than $326.25 per workweek ($7.25 per hour x 45 hours) from Ovation.

Plaintiffs' claims are without merit. Plaintiffs received at least the federal minimum wage throughout their employment with Ovation. Doc. 31-1 at ¶ 12; Cordell Dec. at ¶¶ 11, 14, 18, 21, 24; Cordell Dec. Exs. A-C. Indeed, Plaintiffs' own document supports that conclusion. *See* Pl.'s Am. Initial Disclosure at Ex. A, pp. 2-7 (identifying hourly regular rates for each of the Plaintiffs above $7.25 per hour). However, even if Plaintiffs' allegations were to be taken at face value, simple arithmetic demonstrates that their minimum wage claims fail. Ovation paid Diggs, Jackson, Robinson, Szabo, and Wessels a standard hourly rate of $11.50 during their respective periods of employment as Credit Analysts. Further, Ovation paid Gosse a standard rate of $12.50 per hour during the relevant period. Extrapolating those

figures out, Diggs, Jackson, Robinson, Szabo, and Wessels would have earned $460.00 per 40 hours of work – exceeding the amount of federal minimum wage that Plaintiffs could have earned at 45 hours by $133.75 (or more than 18 hours at $7.25). Ovation would have paid Gosse $500.00 per 40 hours of work – eclipsing the Plaintiffs' $326.25 minimum wage threshold by $173.75 (or almost 24 hours at $7.25). *See* Gosse Dep. at 35:23 to 36:1.

Because the undisputed record evidence establishes that Plaintiffs were paid at least the federal minimum wage for each hour worked during their employment with Ovation, summary judgment on Plaintiffs' minimum wage claims is warranted.

## III.  CONCLUSION

As the *Reich* court recognized, the purpose of federal wage and hour law is, *inter alia*, "to protect overtime workers from the dangers which a long work week may entail." 1997 WL 1507504, at *6. Like the workers in *Reich*, Plaintiffs here are not those for whom the overtime provisions were designed. Because (1) Ovation is a retail or service establishment, (2) more than half of Plaintiffs' compensation (except for Wessels) for the representative periods was from commissions on goods and services, and (3) Plaintiffs' regular rate of pay exceeded one and one-half times the federal minimum wage during the representative periods, Plaintiffs' are exempt from overtime compensation pursuant to § 7(i). Further, Plaintiffs' made more than the federal minimum wage throughout the entirety of their employment. Accordingly, Defendants respectfully request that the Court enter an Order granting partial summary judgment in their favor and against Plaintiffs.

Respectfully submitted this 22nd day of May 2019.

By: */s/ Michael J. Lufkin*
    Eric J. Holshouser
    Florida Bar No. 307734
    E-mail: eholshouser@rtlaw.com

    Michael J. Lufkin
    Florida Bar No. 0030492
    E-mail: mlufkin@rtlaw.com

    ROGERS TOWERS, P.A.
    1301 Riverplace Boulevard, Suite 1500
    Jacksonville, FL  32207
    (904) 398-3911 – Telephone
    (904) 348-5894 – Facsimile

    Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that the foregoing Motion for Partial Summary Judgment and Supporting Memorandum of Law was electronically filed this 22nd day of May 2019 by using CM/ECF systems, which will send notice of electronic filing of the foregoing document to the following:

    Andrew R. Frisch
    Chanelle Ventura
    Morgan & Morgan, P.A.
    600 North Pine Island Road, Suite 400
    Plantation, FL 33324
    E-mail: afrisch@forthepeople.com
           cventura@forthepeople.com

    Attorneys for Plaintiff and Opt-in Plaintiffs

        */s/ Michael J. Lufkin*
        Attorney