VERNON DIGGS, individually and
on behalf of those similarly situated,

       Plaintiffs,

                                    Case No. 3:18-cv-367-J-34MCR

v.

OVATION CREDIT SERVICES, INC.,
TERRY D. CORDELL, and AMY MYERS,

       Defendants.

_____/

## O R D E R

    **THIS CAUSE** is before the Court on the parties' cross-motions for partial summary

judgment, see Plaintiff's Motion for Partial Summary Judgment and Incorporated

Memorandum of Law (Doc. 54; Plaintiffs' Motion), filed on May 22, 2019; Defendants

Ovation Credit Services, Inc., Terry D. Cordell, and Amy Myers' Motion for Partial Summary

Judgment and Supporting Memorandum of Law (Doc. 55; Defendants' Motion), filed on

May 22, 2019 (collectively, Cross-Motions), and their respective responses, see Plaintiff's

Response in Opposition to Defendants' Motion for Partial Summary Judgment (Doc. 64;

Plaintiffs' Response); Defendants Ovation Credit Services, Inc., Terry D. Cordell, and Amy

Myers' Response Opposing Plaintiff's Motion for Partial Summary Judgment (Doc. 65;

Defendants' Response).  With leave of Court, see Orders (Doc. 68 & 70), the parties each

filed a reply on July 27, 2019. See Plaintiffs' Reply to Defendants' Response in Opposition

to Plaintiff's Motion for Partial Summary Judgment (Doc. 71; Plaintiffs' Reply); Defendants'

Reply to Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment (Doc. 72; Defendants' Reply).  As such, the Cross-Motions are ripe for review.

## I.    Background

Plaintiff Vernon Diggs, individually and in a representative capacity, initiated the instant action on March 16, 2018, by filing a Complaint and Demand for Jury Trial (Doc. 1; Complaint) against Defendants Ovation Credit Services, Inc., Terry D. Cordell, and Amy Myers.  In the Complaint, Diggs asserts violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.[1]  Specifically, he alleges that Defendants violated the FLSA by failing to compensate him and other similarly situated employees for their overtime hours (Count One) and by failing to pay him and other similarly situated employees the statutorily required minimum wage (Count Two).  Between March 26, 2018 and July 3, 2018, five other Ovation employees (Kimberly Gosse, Ernest Jackson, Michael Robinson, Gabor Szabo, and Daniel Wessels) opted into the litigation by filing notices of their consent to become party plaintiffs.  See Notices of Consent to Join (Doc. 7-1; Doc. 8-1; Doc. 11-1; Doc. 15-1; Doc 21-1).  On September 28, 2019, the Court granted Plaintiffs' Motion to Conditionally Certify Collective Action (Doc. 25; Motion to Certify), see Order Granting Motion to Certify (Doc. 77), and on January 9, 2020, the Court approved the parties' proposed class notice, see Order Denying Motion to Toll Statute of Limitations and Approving Class Notice (Doc. 91).[2]

---

[1] Although their titles have since changed, Cordell and Myers were President and Vice President, respectively, of Ovation at the time of the alleged events giving rise to this lawsuit.

[2] Four additional employees have opted into this litigation since the parties distributed their class notice.  See Notices of Filing Consent to Join (Docs. 95, 96, 98, 103).

## II.    Relevant Facts[3]

Ovation provides "services to consumers to help them resolve inaccuracies on their credit report."  See Plaintiffs' Motion, Exhibit G: Deposition of Terry Cordell (Doc. 54-7; Cordell Dep.) at 33.  These services include "education to consumers for credit and credit use," as well as "services to help them optimize their individual credit profiles."  Id.  Ovation also works "with consumers to assist them in disputing inaccurate or misleading information from their credit reports via the credit bureaus."  See id., Exhibit H: Deposition of Amy Myers (Doc. 54-8; Myers Dep.) at 14-15.  Plaintiffs were employed by Ovation as credit analysts where their primary duties were "to speak with [Ovation's] customers and to enroll them into [Ovation's] credit repair services" through inbound and outbound telephone calls.  See Cordell Dep. at 25, 38.  Ovation obtains customers through partner referrals or after customers discover Ovation on their own through Ovation's website.  See id. at 33.  Ovation's referral partners are "generally mortgage lenders or partners that are associated with the lending space.  So they all typically offer some type of service around qualifying somebody with their credit score, and they refer them to [Ovation], in most cases, whenever those individuals['] credit scores prevent them from working with that original partner."  Id. at 34.  Notably, Ovation's largest referral partner was Lending Tree, see Myers Dep. at 16, which purchased Ovation in 2018, see Cordell Dep. at 14-15.

In 2015, Ovation primarily made outbound calls to consumers referred to Ovation by its lending referral partners.  Id. at 38. In 2016, Ovation "started receiving inbound calls at a higher rate.  And now today, the majority . . . [is] inbound."  Id. at 38-39.  Nevertheless,

---

[3] Although the parties disagree about the legal conclusions to be drawn from the evidence, the facts regarding the nature of Ovation's business are undisputed.  In contrast, the facts regarding Plaintiffs' alleged overtime work are disputed.

from 2016 to 2018, Ovation focused primarily on contacting individuals referred to Ovation through its partners.  Id. at 36.

Ovation paid its credit analysts an hourly rate, with the ability to earn commissions depending on the number of sales made.  See id. at 43, 74-75.  Although termination was not "the first course of action," credit analysts could be terminated if they did not meet the requisite sales quota in a given period."  Id. at 74.  Plaintiffs allege, and Defendants dispute, that Defendants prohibited Plaintiffs from recording more than 40 hours in a single week and that many credit analysts were unable to meet their sales quotas each pay period if working only 40 hours a week.  See, e.g., Plaintiffs' Motion, Exhibit A: Deposition of Vernon Diggs (Doc. 54-1; Diggs Dep.) at 47-48; id., Exhibit I: Declaration of Tara McCool (Doc. 54-9; McCool Decl.) at 3-4.  Plaintiffs further allege that to "avoid being written-up and subjected to the possibility of being terminated," they worked overtime without clocking in. See id.  Plaintiffs allege that Defendants knew or should have known that they were working off the clock.  See McCool Decl. at 3.  Plaintiffs also allege that, even though they were generally not paid for their unrecorded overtime work, to the extent that Plaintiffs recorded a nominal amount of overtime, Defendants failed to pay them the proper overtime rate. See Plaintiffs' Motion at 12; id., Exhibit L: Selected Payroll Records (Doc. 54-12; Payroll Records).

## III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson,

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## IV. Discussion

In their respective Cross-Motions, both parties seek a determination as to whether § 207(i) of the FLSA applies to exempt Plaintiffs from the FLSA's overtime pay requirement. See Plaintiffs' Motion at 13-22; Defendants' Motion at 11-22. In addition, Plaintiffs also ask the Court to enter partial summary judgment finding that, on the few occasions that Plaintiffs recorded a nominal amount of overtime, Defendants failed to include commissions when calculating Plaintiffs' overtime pay rate, as required by the FLSA. See Plaintiffs' Motion at 22-23. Finally, Defendants also seek partial summary judgment on Plaintiffs' minimum wage claims in Count Two, arguing that Defendants properly paid Plaintiffs minimum wage for all hours worked. See Defendants' Motion at 23-24. The Court will address each issue in turn, starting with the applicability of the § 207(i) exemption.

**A.      The § 207(i) Exemption**

As a general rule, § 207 of the FLSA requires an employer to pay an employee for hours worked over 40 in a week at a rate not less than "one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  However, "[t]he FLSA's overtime [pay] requirement is subject to exemptions," and the employer has the burden of showing an entitlement to an exemption.  White v. Dixie, 741 F. App'x 649, 662 (11th Cir. 2018) (citing Jeffery, 64 F.3d at 594).  In construing FLSA exemptions, courts are required to give the exemptions a "fair reading."  See Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018).[5]

As relevant here, the FLSA exempts from its overtime pay requirement certain commissioned employees of a "retail or service establishment."  See 29 U.S.C. § 207(i). Also known as the commissioned work exemption, § 207(i) provides as follows:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

---

[5] Before the Supreme Court's decision in Encino, Eleventh Circuit precedent instructed "that a FLSA exemption must be narrowly construed so that it applies to those plainly within its terms and spirit."  Gregory v. First Title of Am., Inc., 555 F.3d 1300, 1302 (11th Cir. 2009) (citing Nicholson v. World Bus. Network, Inc., 105 F.3d 1361, 1364 (11th Cir. 1997)).  Contrary to Plaintiffs' arguments, see Plaintiffs' Response at 12 n.19, the Supreme Court explicitly rejected this principle in Encino.  See Encino, 138 S. Ct. at 1142 ("Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation." (internal quotation marks and citation omitted)); see also Carley v. Crest Pumping Techs., LLC, 890 F.3d 575, 579 (5th Cir. 2018) ("The Supreme Court recently clarified that courts are to give FLSA exemptions a 'fair reading,' as opposed to the narrow interpretation previously espoused by this and other circuits." (citing Encino, 138 S. Ct. at 1142)).

29 U.S.C. § 207(i). Thus, to establish entitlement to the commissioned work exemption, the employer must show that: (1) it is a retail or service establishment; (2) the employee's regular rate of pay exceeds one and one-half times the federal minimum wage; and (3) the employee earns more than half his salary in commissions from goods and services during a representative period of not less than one month. See id. See also Rodriguez v. Home Heroes, LLC, Case No. 8:13-cv-2711-T-26AEP, 2015 WL 668009, at *5 (M.D. Fla. Feb. 17, 2015) (stating the elements of the commissioned work exemption). For the reasons set forth below, the Court determines that the record undisputed facts establish that Ovation is not a retail or service establishment as contemplated by the FLSA and its accompanying regulations.[6] As such, the Court need not determine whether Plaintiffs' regular rates of pay exceeded one and one-half times the statutory minimum wage or whether they earned more than half their salaries in commission. Before turning to the parties' specific arguments regarding Ovation's status as a retail or service establishment, however, the Court will first set out the relevant legislative history and regulatory framework of the commissioned work exemption.

When Congress added the commissioned work exemption to the FLSA in 1961, it did not define the term "retail or service establishment" within § 207(i). See Fair Labor Standards Amendments of 1961, Pub. L. 87-30, § 6, 75 Stat. 65, 69-70 (1961) (1961 Amendments). However, Congress had previously defined the term in § 213(a)(2)—the former intrastate businesses exemption—to "mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or both) is not for resale and is

---

[6] "The determination of whether an establishment qualifies as retail is a matter of law for the court." Rodriguez, 2015 WL 668009, at *5 (citation omitted).

recognized as retail sales or services in the particular industry[.]" Id. at 71. Although Congress repealed § 213(a)(2) in 1989, see Pub. L. 101-157, § 3(c)(1), 103 Stat. 939 (1989), courts continue to apply § 213(a)(2)'s definition of retail or service establishment to the commissioned work exemption. See, e.g., Reich v. Delcorp, Inc., 3 F.3d 1181, 1184 (8th Cir. 1993) (rejecting argument that "Congress's 1990 repeal of the § 213(a)(2) exemption also repealed the judicial and administrative construction of that term as it appears in § 207(i)"); Gieg v. DDR, Inc., 407 F.3d 1038, 1050 (9th Cir. 2005) (applying § 213(a)(2)'s definition of "retail or service establishment," as well as its accompanying regulations, to the commissioned work exemption); Kelly v. A1 Tech., Case No. 09-cv-962-LAK-MHD, 2010 WL 1541585, at *10 (S.D.N.Y. Apr. 12, 2010) ("The courts have also uniformly concluded that, despite the 1989 repeal of the exemption in section 13(a)(2) for certain retail or service establishments, the definition of a retail or service establishment that was contained in that section still applies to the phrase as used in section 7(i).") (collecting cases), report and recommendation adopted (Doc. 44; July 13, 2010).[7]

---

[7] The Seventh Circuit has questioned whether § 213(a)(2)'s definition of retail or service establishment was ever meant to apply to the commissioned work exemption. See Alvarado v. Corp. Cleaning Services, Inc., 782 F.3d 365, 369-70 (7th Cir. 2015) ("Section 213(a)(2) is an exemption for intrastate businesses from the [FLSA's] overtime and wage requirements. Although two congressional reports discussing the amendment that added the commission exemption to the Act said that "retail or service establishment" is defined in section 213(a)(2) . . ., the reports are not the law and don't explain why a definition meant for the intrastate business exemption should also apply to the commission exemption; the two provisions serve different purposes."). Given the overwhelming authority cited above reaching the opposite conclusion, the Court does not find Alvarado to be persuasive. Indeed, the Department of Labor's regulations interpreting § 207(i) state that the § 213(a)(2) definition of retail or service establishment applies to the commissioned work exemption. See 29 C.F.R. § 779.411 ("The term 'retail or service establishment' is defined in section 13(a)(2) of the [FLSA]. The definition is set forth in § 779.24; its application is considered at length in subpart D of this part."). In any event, the parties do not dispute that § 213(a)(2)'s definition applies here. See Defendants' Motion at 12; Plaintiffs' Motion at 14.

The Department of Labor (DOL) regulations applicable to former § 213(a)(2) are found in 29 C.F.R. Part 779, Subpart D.[8]  Importantly, the DOL regulations set out a threshold "retail concept" requirement that an employer must satisfy to be considered a retail or service establishment.  See Brennan v. Great Am. Disc. & Credit Co., Inc., 477 F.2d 292, 295 (5th Cir. 1973) (stating that a business must satisfy a "threshold 'retail concept' test . . . before the industry characterization of its sales can be considered").[9]  Specifically, the regulations instruct that "the term 'retail or service establishment' as used in the [FSLA] does not encompass establishments in industries lacking a 'retail concept.'"[10]  29 C.F.R. § 779.316.  Thus, establishments lacking a traditional retail concept "cannot under any circumstances qualify as a 'retail or service establishment' within the statutory

---

[8] These regulations, which are interpretative rules that were not subject to notice-and-comment rulemaking, "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 97 (2015) (internal quotation marks and citation omitted); see also Fair Labor Standards Act as Applied to Retailers of Goods or Services, 29 Fed. Reg. 5856 ("The administrative procedure provisions of 5 U.S.C. 553 which require notice of proposed rule making, opportunity for public participation, and delay in effective date are not applicable because these are interpretative rules.").  "They are, however, 'entitled to respect under . . . Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade.'" Gregory, 555 F.3d at 1302 (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)).  See also Brennan, 477 F.2d at 296-97 ("Although courts are not bound by interpretative bulletins, see 29 C.F.R. § 779.8, they provide us with guidance simply because they reflect the position of those most experienced with the application of the Act.  The bulletins persuasiveness depends upon its thoroughness, its consistency, and the validity of its reasoning.  It is evident to us that the Administrator has considered all relevant issues." (internal citations omitted)).

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[10] As evidence of Congress's intent to establish a retail concept requirement, the DOL regulations cite to, among other things, the legislative history of the 1949 amendments to the FLSA.  See 29 C.F.R. § 779.316 ("The term 'retail' is alien to some businesses or operations. . . .  As to establishments of such businesses, therefore, a concept of retail selling or servicing does not exist.  That it was the intent of Congress to exclude such businesses from the term 'retail or service establishment' is clearly demonstrated by the legislative history of the 1949 amendments and by the judicial construction given said term both before and after the 1949 amendments.").  Indeed, the conference report for the 1949 amendments to the FLSA state that § 213(a)(2) "does not exempt banks, insurance companies, building and loan associations, credit companies, newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc., because there is no concept of retail selling or servicing in these industries." H.R. Rep. No. 81-1453 at 25-26 (emphasis added).  See also Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 202 (1966) ("[I]t is generally helpful to ask first whether the sale of a particular type of goods or services can ever qualify as retail whatever the terms of sale[.]").

definition of the [FSLA] . . . ." Id.  However, "[d]etermination of whether a business fits the retail concept is not without difficulty.  . . .  In trying to define the characteristics of such an establishment, the regulations acknowledge that a precise line cannot be drawn and exact objective standards cannot be established." Brennan, 477 F.2d at 296 (citing 29 C.F.R. §§ 779.312-779.321).  "The approach is necessarily case-by-case in determining whether the particular establishment possesses a retail concept." Rodriguez, 2015 WL 668009, at *7 (citing Shultz v. Crotty Brothers Tex., Inc., 310 F. Supp. 761, 767 (E.D. Tex. 1970)). Nevertheless, the DOL regulations provide guidance for making such a determination by, among other things, setting forth some of the characteristics of a retail or service establishment:

> Typically a retail or service establishment is one which sells goods or services to the general public.  It serves the everyday needs of the community in which it is located.  The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process.  . . .  Such an establishment sells to the general public its food and drink.  It sells to such public its clothing and its furniture, its automobiles, its radios and refrigerators, its coal and its lumber, and other goods, and performs incidental services on such goods when necessary.  It provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living.  Illustrative of such establishments are:  Grocery stores, hardware stores, clothing stores, coal dealers, furniture stores, restaurants, hotels, watch repair establishments, barber shops, and other such local establishments.

29 C.F.R. § 779.318(a).

Although "every business might be said to perform a service," the DOL regulations instruct "that all business establishments are not making sales of 'services' of the type contemplated in the [FLSA]; that is, services rendered by establishments which are

traditionally regarded as local retail service establishments such as the restaurants, hotels, barber shops, repair shops, etc.  (See §§ 779.315 through 779.320.)  It is to these latter services only that the term 'service' refers."  29 C.F.R. § 779.314 (emphasis added).  See also Kelly, 2010 WL 1541585, at *11 ("As for the meaning of the phrase 'a retail or service establishment,' the DOL has stated that the term 'service establishment' is to be understood to mean a 'retail service establishment[ ].'" (quoting 29 C.F.R. § 779.314) (other citations omitted)).

Additionally, the regulations provide examples of establishments that are considered retail and those that are not.  See 29 C.F.R. § 779.317; 29 C.F.R. § 779.320.  The examples of establishments that may be considered retail include antique shops, automobile shops, book stores, cigar stores, clothing stores, department stores, drapery stores, furniture stores, jewelry stores, shoe repair shops, sporting goods stores, stationary stores, etc.  See 29 C.F.R. § 779.320.  In contrast, the partial list of establishments lacking a retail concept includes accounting firms, credit bureaus and collection agencies, banks, brokers, building and loan associations, finance companies, insurance companies, income tax return preparers, lawyers' offices, license and legal document service firms, loan offices, security dealers, title and abstract companies, trust companies, etc.  See 29 C.F.R. § 779.317; see also Mitchell v. Kentucky Finance Co., 359 U.S. 290 (1959) (concluding that establishment "engaged in the business of making personal loans . . . and in purchasing conditional sales contracts from dealers in furniture and appliances" do not qualify as "retail or service establishments" as originally defined by 29 U.S.C. § 213(a)(2)).

Finally, the Court notes that § 207(i) "was enacted to relieve an employer from the obligation of paying overtime compensation to certain employees of a retail or service

establishment paid wholly or in greater part on the basis of commissions." 29 C.F.R. § 779.414. The DOL regulations interpreting § 207(i) describe these employees as generally working in

> so-called "big ticket" departments and those establishments or parts of establishments where commission methods of payment traditionally have been used, typically those dealing in furniture, bedding and home furnishings, floor covering, draperies, major appliances, musical instruments, radios and television, men's clothing, women's ready to wear, shoes, corsets, home insulation, and various home custom orders. . . .

Id.

Applying these guiding principles to the instant case, the Court is of the view that Ovation lacks a traditional retail concept as contemplated by the FLSA and its accompanying regulations. Ovation does not, for example, provide the "public its clothing and its furniture, its automobiles, its radios and refrigerators, its coal and its lumber, [or] other goods," nor does it perform "incidental services on such goods[.]" See 29 C.F.R. § 779.318. Moreover, the Court is hard-pressed to find that credit repair services constitute "services for the comfort and convenience of such public in the course of its daily living." Id. It appears that many, if not most, of Ovation's clients are individuals referred to Ovation by a lender after having declined to approve the individual for a loan. Defendants have not established that this is a service needed by the general public. See generally Underwood v. NMC Mortg. Corp., Case No. 07-cv-2268-EFM, 2009 WL 1269465, at *6 (D. Kan. May 6, 2009) ("[I]t does not appear to the Court that matching individuals with residential mortgage lenders would qualify as selling to the 'general public' or serving the 'everyday needs' of the public."); Esparza v. Two Jinn, Inc., Case No. 09-cv-0099-AG-RNB, 2010 WL 11507642, at *4 (C.D. Cal. Sept. 22, 2010) ("The need for a bail bond is not 'for the comfort

and convenience of [the] public in the course of its daily living.'" (quoting 29 C.F.R. §

779.317)).

Although credit repair companies are not specifically included in either the list of

establishments that may be considered retail, see 29 C.F.R. § 779.320, or the list of

establishments lacking a retail concept, see 29 C.F.R. § 779.317, a comparison of the lists

further supports the Court's conclusion that Ovation is not a retail or service establishment

for purposes of the commissioned work exemption. Defendants compare Ovation "to those

establishments providing general repair services for the public that the Secretary of Labor

has deemed having a 'retail concept' like automobile repair shops, fur repair shops,

refrigerator service repair shop, shoe repair shops, and watch, clock, and jewelry repair

establishments." Defendants' Motion at 14. However, these repair services deemed by

the DOL to have a retail concept are engaged in the service of repairing goods sold by

businesses that have a traditional retail concept. It is unclear what retail good, if any,

Ovation could claim to be repairing. Instead, credit repair organizations are more similar

to establishments like credit bureaus and collection agencies, banks, brokers, building and

loan associations, and finance companies, which have been found to lack a retail concept,

than they are to the types of establishments in § 779.320's list of businesses that do have

a retail nature. See Parker v. ABC Debt Relief, Ltd. Co., Case No. 3:10-cv-1332-P, 2013

WL 371573, at *10 (N.D. Tex. Jan. 28, 2013) ("Defendants' debt negotiation and settlement

business was similar to other establishments that lack a 'retail concept'—such as banks,

brokers, credit companies, and loan offices."); Hodgson v. N.G. Kallas Co., 480 F.2d 994,

996 (6th Cir. 1973) ("Although the legislative history does not specifically mention

bookkeeping and tax reporting services, it does relate that other businesses providing

assistance with financial records, such as banks, insurance companies, building and loan associations, and credit companies, are not retail as that term is used in the exemption provision.").

Defendants argue that Plaintiffs are attempting "to shoehorn Ovation's business into a dated DOL regulation, 29 C.F.R. § 779.317, with arcane financial industry concepts that simply do not apply in modern commerce." Defendants' Response at 8. The Court acknowledges that the DOL regulations are not without controversy. Indeed, because the regulations are not entitled to Chevron[11] deference, see supra note 8, "[c]ourts have applied varying degrees of deference to the regulations issued by the DOL." Rodriguez, 2015 WL 668009, at *6. For example, Defendant relies on Reich v. Cruises Only, Inc., in which the district court concluded that 29 C.F.R. § 779.317's exclusion of "a travel agency from those establishments possessing a retail concept appear[s] to be arbitrary and without any rational basis explained in the regulations." Case No. 95-cv-660-Orl-19, 1997 WL 1507504, at *5 (M.D. Fla. 1997). However, Defendants do not specifically ask the Court to reach such a conclusion in this case regarding any particular establishment on § 779.317's list. Moreover, the Court finds that arguments directed at the workability or outdatedness of the regulations "are best directed at Congress or the Department of Labor rather than this Court." Saunders v. Ace Mortg. Funding, Inc., Case No. 05-cv-1437-DWF-SRN, 2007 WL 1190985, at *7 (D. Minn. Apr. 16, 2007) (internal quotation marks and citation omitted). See also Tyler v. Homebanc Mortgage Corp., Case No. 06-cv-60332, 2007 WL 9700948, at *6 (S.D. Fla. Apr. 10, 2007) (stating that request to "revisit the definition of the 'retail and

---

[11] Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

service establishment' exemption . . . is more appropriately reserved to Congress or the Department of Labor.").

Defendants also argue that the Credit Repair Organization Act (CROA), 15 U.S.C. §§ 1679 et seq., establishes Congress's intent to recognize the retail nature of credit repair organizations like Ovation. See Defendants' Response at 8. The Court finds this argument unavailing, as CROA does not appear to have any connection to the FLSA. Nor does CROA actually declare credit repair organizations to be retail in nature. Instead, CROA merely recognizes that "[c]onsumers have a vital interest in establishing and maintaining their credit worthiness." See 15 U.S.C. § 1679(a). The purposes of CROA are "to insure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services" and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." Id. at § 1679(b). This hardly represents Congress's intent to establish the retail nature of such organizations for purposes of an exemption to the FLSA.

To further support their argument that Ovation is an establishment with a retail concept, Defendants point to an Opinion Letter in which the DOL opines that a company selling "a technology platform to merchants that enables online and retail merchants to accept credit card payments from their customers from a mobile device, online, or in-person," constitutes a retail or service establishment under § 207(i). See Defendants' Motion at 15; U.S. Dep't of Labor, Wage and Hour Div. Opinion Letter FLSA 2018-21, 2018 WL 4562931, *3 (Aug. 28, 2018) (Opinion Letter). In short, the DOL concluded that the company qualified as a retail or service establishment because it "sells its platform to a

variety of purchasers, the platform serves their everyday needs, the platform is not distributed further once sold, and [the company] does not sell large quantities of the platform to any single customer." Opinion Letter, 2018 WL 4562931, at *1. Defendants argue that "[l]ike the technology platform provider in the DOL's letter, Ovation meets the criteria of a retail or service establishment." Defendants' Motion at 15. Given the factual nature of the inquiry at hand, the Court is not persuaded by the Opinion Letter. Indeed, it appears that Ovation has little in common with the company described in the Opinion Letter, a company that would appear to provide a service of use to every online purchaser and seller.

For similar reasons, the Court is not persuaded by Defendants' argument that "[n]umerous federal courts have recognized that businesses like Ovation, which advertise to the public and are engaged in sales directly to consumers via call centers, sell their goods or services to the general public." Id. at 16 (internal quotation marks and citations omitted). In particular, Defendants rely on the following district court decisions: Reich, 1997 WL 1507504, at *4 (concluding that travel agency specializing in cruise vacations serves everyday needs of community); Wells v. TaxMasters, Inc., Case No. 4:10-cv-2373, 2012 WL 4214712, at *6 (S.D. Tex. Sept. 18, 2012) (concluding tax preparation and resolution services were "services for the comfort and convenience of such public in the course of its daily living" (quoting 29 C.F.R. § 779.318)); La Parne v. Monex Deposit Co., 714 F. Supp. 2d 1035, 1044 (C.D. Cal. 2010) ("While the purchase of precious metals may not initially sound like a basic need of members of the community, it is when looking to the two basic purposes for which buyers purchase precious metals-collecting the metals and investing the metals. These two purposes are integral uses of the community."); Selz v.

Investools, Inc., Case No. 2:09-cv-1042-TS, 2011 WL 285801, at *6 (D. Utah Jan. 27, 2011) ("Investools, as a marketer of materials that teach and aid individuals to do their own financial investing, does not fit into the traditional concept of an educational institution, such as a for-profit university; a finance company, such as a bank; or an investment counseling firm. Consequently, the Court finds that marketing tools to aid individuals in independently investing personal funds is its own industry. Furthermore, the Court finds that this industry, which relies on selling its products directly to individual purchasers who will use the product, has a retail concept."). These district court cases are not binding on this Court; nor does the Court find them to be particularly persuasive given the regulatory framework set out above and the factual nature of the determination.

Thus, fairly construing the commissioned work exemption, the Court finds as a matter of law that Ovation is not a retail or service establishment. As such, Plaintiffs' Motion will be granted, in part, and Defendants' Motion will be denied, in part, to the extent the Court determines that Plaintiffs are not exempt from the FLSA's overtime pay requirement pursuant to § 207(i).

### B. Plaintiffs' Minimum Wage Claims

Defendants ask the Court to enter partial summary judgment on Plaintiffs' minimum wage claims in Count Two of the Complaint. In doing so, Defendants maintain that, even assuming arguendo that Plaintiffs worked five hours of unrecorded overtime each week, Defendants still paid Plaintiffs "at least the federal minimum wage throughout their employment with Ovation." Defendants' Motion at 23. Specifically, Defendants contend that

> Ovation paid Diggs, Jackson, Robinson, Szabo, and Wessels a
> standard hourly rate of $11.50 during their respective periods of

employment as Credit Analysts. Further, Ovation paid Gosse a standard rate of $12.50 per hour during the relevant period. Extrapolating those figures out, Diggs, Jackson, Robinson, Szabo, and Wessels would have earned $460.00 per 40 hours of work – exceeding the amount of federal minimum wage that Plaintiffs could have earned at 45 hours by $133.75 (or more than 18 hours at $7.25). Ovation would have paid Gosse $500.00 per 40 hours of work – eclipsing the Plaintiffs' $326.25 minimum wage threshold by $173.75 (or almost 24 hours at $7.25).

Id. at 23-24. In response, Plaintiffs state that, "[f]or the purposes of this Motion, Plaintiffs do not dispute that they were compensated at least the Florida minimum wage for all hours that they worked when their commissions are properly included in their regular rate of pay and divided by all hours worked."[12] Plaintiffs' Response at 2 n.1. Moreover, although Plaintiffs ask the Court to "enter an order denying Defendants' Motion in its entirety," they do not include any argument in opposition to Defendants' request for summary judgment on Count Two in their Response. Thus, Plaintiffs appear to concede that Defendants paid Plaintiffs at least the Florida minimum wage throughout their employment. Upon review of the record, Defendants' request for partial summary judgment on Plaintiffs' minimum wage claims in Count Two is due to be granted.

### C. Failure to Include Commissions in Overtime Pay Calculations

Plaintiffs also ask the Court to enter partial summary judgment finding "that Defendants miscalculated Plaintiffs['] regular rate of pay each week by failing to include Plaintiffs' commissions in the calculation of their [overtime pay] rate." See Plaintiffs' Motion at 23. Specifically, Plaintiffs contend that on the few occasions they recorded a nominal amount of overtime hours, e.g., by forgetting to clock out on time, Defendants paid Plaintiffs

---

[12] The Court notes that the Florida minimum wage was higher than the federal minimum wage during the years relevant to this lawsuit. See Plaintiffs' Motion, Exhibit Q: Florida Minimum Wage History (Doc. 54-17).

at a rate of time and one-half their base hourly rate, without including Plaintiffs' commissions in the calculation. See id. at 22-23. To support this argument, Plaintiffs have submitted portions of payroll records for Diggs, Gosse, and Robinson. See id. at 12, 23; Payroll Records. Plaintiffs do not include payroll records showing that Defendants also failed to include commissions when calculating the overtime pay rate of Jackson, Szabo, and Wessels. Likewise, Plaintiffs do not submit any evidence that those employees ever actually recorded any overtime hours. Nevertheless, Plaintiffs argue that Defendants improperly calculated overtime rates anytime a credit analyst "recorded a nominal number of overtime hours." Id. at 12.

In response, Defendants agree that "the FLSA generally requires employers to include commissions when calculating the regular rate of pay for overtime purposes." Defendants' Response at 19. Defendants also "acknowledge that the payroll records Diggs filed in support of his Motion indicate that Gosse, Diggs, and Robinson worked a de minimis amount of overtime that was compensated at a rate of one and one-half times their base hourly rates." Id. Nevertheless, Defendants maintain that Plaintiffs' "proof is both incomplete and questionable, rendering summary judgment on the present liability issue inappropriate." Id. Specifically, Defendants argue that Plaintiffs have failed to carry their "burden to show that no genuine issues of material fact exist," because they have "only provided payroll records for [Diggs], Gosse, and Robinson." Id. In response to this argument, Plaintiffs contend that they are entitled to partial summary judgment on this issue "[i]nasmuch as it is undisputed that Defendants' failed to include the commissions in the calculation of the regular rate and resulting overtime rates." Plaintiffs' Reply at 5.

Plaintiffs have submitted undisputed evidence that Defendants failed to accurately calculate the overtime pay of three of the Plaintiffs in this case. Moreover, Defendants do not contend, or submit any evidence to show, that their miscalculation was limited to Diggs, Gosse, and Robinson. As such, the Court finds it appropriate to enter partial summary judgment finding that Defendants failed to include commissions when calculating the appropriate overtime pay rate. However, it will be up to each individual Plaintiff to come forward with specific evidence at trial showing the exact amount of any damages resulting from Defendants' failure to do so.

Accordingly, it is

**ORDERED:**

1. Plaintiff[s'] Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 54) is **GRANTED in part** and **DENIED in part** as stated herein.

   a. Plaintiffs' Motion is **GRANTED** to the extent the Court finds that Plaintiffs are not exempt from the FLSA's overtime pay provisions pursuant to § 207(i).

   b. Plaintiffs' Motion is **GRANTED** to the extent that the Court finds that Defendants failed to include commissions when calculating the regular rate of pay for overtime purposes.

   c. Plaintiffs' Motion is **DENIED** in all other respects.

2. Defendants Ovation Credit Services, Inc., Terry D. Cordell, and Amy Myers' Motion for Partial Summary Judgment and Supporting Memorandum of Law (Doc. 55) is **GRANTED in part** and **DENIED in part** as stated herein.

   a. Defendants' Motion is **GRANTED** to the extent that the Court enters partial summary judgment in Defendants' favor with regard to Count Two of the Complaint.

b.      Defendants' Motion is **DENIED** in all other respects.

**DONE AND ORDERED** in Jacksonville, Florida on March 27, 2020.

MARCIA MORALES HOWARD
United States District Judge

lc23
Copies to:
Counsel of Record